MEMORANDUM OF DECISION RE TERMINATION OF PARENTAL RIGHTS
This memorandum of decision addresses a petition to terminate the parental rights (TPR) of the respondent mother Audrey D. (Audrey), the biological mother of Rudesia D., (Rudesia), born 3/00. The petition alleges the ground of failure to rehabilitate. Rudesia's father, Rudolf D. (Rudolf), died in 1992.
The Department of Children and Families (DCF) obtained an Order of Temporary Custody (OTC) for Rudesia in 10/00. A neglect/uncared for petition was filed on 10/00. Specific steps were ordered by the court in 10/00 (R.J.). In 5/01, Rudesia was adjudicated neglected and was committed to the care and custody of the Commissioner of DCF. The court (D.J.) reordered the specific steps. An extension of commitment was granted in 5/02. Rudesia has been placed in her current foster home since 10/00.
In 2/02, DCF filed this TPR petition against Audrey. In 3/02, Audrey appeared, entered a denial to the petition and was appointed counsel. On that date, the court (R.J.) granted the State's motion to suspend visitation after an evidentiary hearing. In 5/02, the court (R.J.), in addition to extending the commitment, also approved the permanency plan, which called for termination of Audrey's parental rights and adoption of Rudesia.
In 5/02, the TPR was set down for trial in 8/02. In 8/02, the trial date was changed to 12/02.
On the morning of 12/02, trial commenced and was completed in the same CT Page 116-b day. The State called as witnesses Dr. David Krulee, a psychiatrist, Dr. Julia Ramos Grenier, a psychologist, psychotherapist Elizabeth Tiru and DCF social worker Jan Norvig. All were qualified as experts in their areas of expertise.
The State also submitted into evidence a copy of the DCF TPR social study dated 2/4/02, a report from the Morris Foundation dated 1/7/02, a five page report from LabCorp, a report from Julia Ramos Grenier, Ph.D, dated 1/05/01, an evaluation from David A. Krulee, M.D., dated 11/3/00, and a competency report from Dr. Krulee, dated 5/4/01.[2]
This court has jurisdiction over the pending matters. Notice has been provided in accordance with the applicable provisions of the Practice Book. This court has no reason to believe that there is any action is pending in any other court affecting custody of the child at issue.
 I. FACTUAL FINDINGS
The court has reviewed the petition, the TPR social study, and the other exhibits submitted in evidence. The court has utilized the applicable legal standards[3] in considering this evidence and the testimony of the witness. Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial.
I.A. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF 5/01
As set forth in the social study, Audrey was born in 9/58 in New York, New York, the second of seven children. Audrey indicated that she was raised alternately between her mother and her father and stepmother and reported having had a positive childhood. She reported that she attended high school in the State of New York, but left school in the tenth grade. She reported that she had never held a steady job in her lifetime. As of the date of the social study, Audrey was receiving benefits through the Department of Social Services.
Audrey was married on one occasion to Walter Sr. in 3/81. He is the father of Audrey's two elder sons, Tyrone and Walter Jr. These children are adults and living independently. Audrey reports that her father and stepmother raised these children due to the fact that Walter Sr. was emotionally and physically abusive toward her.
Audrey reports a long-standing history of substance abuse. She reports that she used cocaine and heroin during her pregnancy with Rudesia. As a result of the respondent mother's substance abuse, Rudesia was born with those narcotics in her system. Following the birth of Rudesia, she CT Page 116-c entered Liberation House in Stamford, CT. She has made other short-lived attempts at rehabilitation and, as of the date of the social study, was engaged in outpatient treatment at Morris Foundation. However, the credible testimony elicited at the hearing indicated that Audrey was not engaged in substance abuse treatment as of the date of the hearing.
Unfortunately, Audrey continued to offer positive urine screens for cocaine while adamantly denying any current use. Audrey is anemic and also has a chronic back condition. She reportedly is receiving disability income as a result. Audrey was diagnosed approximately thirteen years ago with a life threatening condition. As of the date of the social study, it appears that Audrey was not receiving any regular treatment for this condition.
Audrey was not in a marital relationship with Rudesia's father, Frederick D. Mr. D. died in March 1992, at the age of forty-two. Audrey has never provided any additional information regarding Mr. D. It is unknown whether or not Mr. D. resided with the family until the time of his death. Rudesia has no apparent memory of her father.
Audrey has two older sons, Tyrone and Walter. Tyrone is currently twenty-one years old and resided in Waterbury. Walter is currently twenty-four years old and resided in New York, NY.
I.B. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF 5/01
In 12/00, 1/02, 1/02, 1/02, 1/02 and 2/02, Audrey submitted urines positive for the presence of cocaine to the Morris Foundation.
An extension of commitment was granted in 5/02. On that same day, the court approved of the permanency plan and found that reasonable efforts to reunify had been made by DCF.
I.C. RUDESIA
Rudesia was born in March 1990 in CT to Audrey and Rudolf. She was the only child born of this union: however, she has two adult half brothers, Tyrone and Walter Jr. Audrey reports no complications during her pregnancy with Rudesia. However, as a result of mother's substance abuse during this pregnancy, Rudesia was born with cocaine and heroin in her system. As of the date of the social study, Rudesia was physically healthy and was up to date with her immunizations. She received regular pediatric care from a Waterbury provider. Rudesia is seen for biweekly therapy at the Child Guidance Clinic, the focus of the work being Rudesia's separation and loss issues. Rudesia was in the fifth grade at CT Page 116-d School. She has made an excellent adjustment to this school and in her first marking period, she made the honor roll.
I.D. SIBLINGS
As previously mentioned, Rudesia has two elder half brothers, Tyrone and Walter Jr. It appears as though Tyrone and Walter were raised primarily by their maternal grandparents due to Audrey's chronic substance abuse issues. Tyrone is currently twenty-one years old and resided in Waterbury. In the past, he had attended visitations with his mother and Rudesia has expressed that she would like to continue to have contact with her brother. The Department was making attempts to locate Tyrone and assess the feasibility of continued visitation. Walter Jr. is currently twenty-four years old and resided in New York, NY. He does not have any contact with Rudesia.
 II. ADJUDICATION
In the adjudicatory phase of these proceedings,[4] the court has considered the evidence and testimony related to circumstances and events occurring through the close of trial,[5] in view of the fact that the only ground alleged against Audrey is failure to achieve rehabilitation.[6] Upon review, as discussed below, the court has determined that statutory grounds for termination exist as to Audrey.
II.A. LOCATION AND REUNIFICATION EFFORTS
The court finds that the petitioner has met its burden of proving, by clear and convincing evidence, that reasonable efforts were made to locate and reunify Audrey with her child.[7] Based on the clear and convincing evidence produced at trial, the court finds that, under the circumstances of this case, Audrey is either unable or unwilling to benefit from reasonable reunification efforts as contemplated by General Statutes § 17a-112 (j) (1).[8]
Multiple services have been provided to Audrey in an effort to reunify her in parenting role with the child at issue in this case. Over the years, DCF has provided case management services, psychological and psychiatric evaluations by court order, inpatient and outpatient psychiatric services including medication management, inpatient and outpatient substance abuse treatment through Morris Foundation, parent training through Family Ties, visitation and transportation.
Unfortunately, after over two years of Rudesia being in DCF's care, Audrey continues to demonstrate her inability to appropriately care for CT Page 116-e Rudesia as she has failed to refrain from substance abuse, and has been substantially noncompliant with her specific steps. She has a long history of polysubstance abuse and mental health issues which have seriously impacted her ability to parent. Despite the continuous availability of services, she is unwilling or unable to acknowledge the severity of her issues and to engage consistently in services. As a result, her progress has been inadequate.
As of January and February 2002, Audrey was actively abusing substances, but adamantly denying it. As of the date of the hearing, she was not involved in any substance abuse treatment. She was not in individual treatment. Finally, Audrey is apparently not actively seeking treatment for her medical condition. Her failure to receive consistent, coordinated care combined with the abuse of substances compromises her mental health status further. Accordingly, the court concludes that, although Audrey has complied with some steps, she is fundamentally either unable or unwilling to reap any meaningful, lasting benefit from reunification efforts and such efforts are inappropriate.
II.B. STATUTORY GROUNDS FOR TERMINATION
II.B.1. FAILURE TO REHABILITATE — § 17a-112 (j) (3) (B) (i)
The petitioner first alleges that Audrey's parental rights should be terminated because she has failed to achieve rehabilitation within the meaning of § 17a-112 (j) (3) (B).[9] As Rudesia was adjudicated neglected and committed to DCF on 5/15/01, the critical issue for this court is whether this respondent has achieved rehabilitation sufficient to render her able to care for Rudesia. Applying the requisite legal standards[10] and construing the statute in compliance with the mandate of § 17a-112 (p),[11] the court finds that the petitioner has proven by clear and convincing evidence that Audrey has failed to rehabilitate herself within the meaning of the statute.
Several aspects of the clear and convincing evidence in this case compel the conclusion Audrey has yet to achieve a sufficient "level of rehabilitation . . . which would reasonably encourage a belief that at some future date she can assume a responsible position in her [child's life]." In re Sarah Ann K., supra, 57 Conn. App. 448. See In re DanielC., 63 Conn. App. 339, 354, 776 A.2d 487 A.2d (2001); In re Ashley S.,supra, 61 Conn. App. 665. First, the credible evidence in this case, presented through the DCF social study, the laboratory testing, the reports and testimony of Drs. Krulee and Ramos-Grenier and the testimony of social worker Norvig clearly and convincingly establishes that Audrey has not achieved § 17a-112 (j) (3) (B) rehabilitation. The court CT Page 116-f credits the DCF reports and the testimony which showed that, despite all attempts to get Audrey into treatment for substance abuse and treatment for mental health issues, she has refused to attend or thwarted the most stalwart of efforts by DCF and/or service providers to help her. Based upon the credible evidence, one cannot help but conclude that Audrey's judgment remains impaired to an extent that interferes with her parenting capacity.
In 5/01, the date of Rudesia's adjudication as being neglected and her commitment to DCF, the contributing factors in the neglect of were Audrey's unwillingness to address her chronic substance abuse and her mental illness. Audrey has never consistently acknowledged or accepted her addiction or her mental illness and has continually denied both. She had refused to seek treatment for either one. As a result, the court concludes that both her judgment and parenting skills were, and continue to be, marginal.
From the time of the Order of Temporary Custody that was granted on 10/00 and throughout the Department's involvement with this family, Audrey has been informed by the court and by DCF that, in order to be reunified with her daughter, she needed to maintain stable housing and income, participate in individual as well as substance abuse counseling, complete substance abuse treatment and maintain her sobriety. In furtherance of this, in 10/00 and subsequently in 5/01, the court ordered for Audrey the following specific steps: Participate in counseling and make progress toward the identified treatment goals.
In 11/00, Audrey participated in a court-ordered psychological evaluation with Dr. Krulee. Dr. Krulee concluded that she suffered from various conditions including Alcohol Dependence, continuous, severe; Heroin Dependence, status unspecified; Cocaine Dependence, status unspecified; Depressive Disorder, Not Otherwise Specified; Psychological Factors Affecting Physical Condition and Personality Disorder, Not Otherwise Specified with Possible Schizotypal and Borderline Features.
In 1/01, Audrey participated in a court-ordered neuropsychological evaluation with Dr. Grenier. Dr. Grenier indicated that Audrey "could benefit from supportive therapy."
In 9/01, during a scheduled visit with Rudesia, Audrey told the child that she was going to commit suicide if Rudesia was not returned to her.
In 11/01, at a scheduled treatment plan review, Audrey denied having any mental health issues. CT Page 116-g
From the date of Rudesia's removal, Audrey has not engaged in individual counseling.
Submit to substance abuse assessment and follow all recommendations.
In 11/00, Audrey failed to appear for her scheduled assessment at the Morris Foundation.
In 12/00, Audrey participated in a substance abuse evaluation through the Morris Foundation and was recommended for once weekly outpatient treatment. Audrey failed to engage in treatment.
In 1/01, Audrey was counseled to comply with treatment recommendations made by the Morris Foundation. Audrey denied having any substance abuse issues and therefore saw no need for treatment.
In 7/01, Audrey participated in a substance abuse evaluation through the Morris Foundation and was recommended for twice weekly outpatient treatment.
In 8/01, Audrey was discharged from the Morris Foundation for noncompliance after she missed four consecutive sessions.
In 1/02, Audrey participated in a substance abuse evaluation through the Morris Foundation and was recommended for twice weekly outpatient treatment.
As of 1/02, Audrey was in danger of being discharged from Morris Foundation for noncompliance with treatment.
Presently, Audrey is not receiving any treatment for substance abuse.
Cooperate with court-ordered evaluations and testing.
Audrey was court ordered to participate in a neuropsychological evaluation with Dr. Grenier.
In 2/01, Audrey failed to attend her second appointment with Dr. Grenier, thereby preventing the completion of this evaluation.
No substance abuse.
In 12/00, Audrey provided a urine sample at the Morris Foundation which was positive for cocaine. CT Page 116-h
A hair analysis conducted on this same date was positive for cocaine use back as far as ninety days.
In 12/00, Audrey appeared at the Department of Social Services apparently under the influence of substances.
In 7/00, Audrey provided a urine sample at the Morris Foundation which was positive for cocaine.
In 9/01, Audrey appeared for her scheduled visit with Rudesia in an inebriated condition.
In 1/02, Audrey provided a urine sample at the Morris Foundation which was positive for cocaine.
In 1/02, Audrey provided a urine sample at the Morris Foundation which was positive for cocaine and was indicative of more frequent or a greater amount of use from the earlier sample.
Audrey is described by Dr. Krulee as a "a complex woman with severe psychiatric, substance abuse, and medical problems." Audrey's issues are of a chronic nature and have existed since, and even prior to the birth of Rudesia. Audrey minimizes or utterly denies health related issues of any nature. Audrey has not made any meaningful efforts toward addressing her mental health issues or her substance abuse problems over the entire course of DCF's intervention.
Given Rudesia's age of twelve years, her need for appropriate physical and emotional nurturing, her need for safety from exposure to substance abuse and her need for a permanent and stable home, Audrey cannot, within a reasonable period of time assume a responsible position in the life of Rudesia.
Despite the services offered, Audrey has failed to demonstrate that within a reasonable time, considering Rudesia's age and needs, she could assume a responsible position in her life. The clear and convincing evidence reveals that from 10/00 and continuing through the time of trial, Audrey was ordered to participate in rehabilitation regimens, and has failed to comply. She remains without the qualities necessary to successfully parent her child. Effectively, she was no better able "to resume the responsibilities of parenting at the time of filing of the termination petition than [she] had been at the time of [Rudesia's] commitment." In re Hector L., supra, 53 Conn. App. Given the ages, sensibilities, needs and satisfactory current placement of the child CT Page 116-i involved, and given Audrey's history of failing to comply with services and continued substance abuse and mental health issues, it would be unreasonable to conclude that she will be able to achieve rehabilitation from her substance abuse, mental health problems and parenting deficits, so as to be able to serve as a safe, responsible parent within a reasonable time. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved that Audrey has failed to achieve rehabilitation pursuant to § 17a-112
(j) (3) (B).
 III. DISPOSITION
As the court has concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child." (Citation and quotation marks omitted.) In reQuanitra M., supra, 60 Conn. App. 103. In this dispositional phase, the court has considered the evidence and testimony related to circumstances and events through the close of evidence. Practice Book 33-5.
III.A. SEVEN STATUTORY FINDINGS
The court has made each of the seven written factual findings required by General Statutes § 17a-112 (k) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights.[12] See In re Jonathon C., supra,63 Conn. App. 528.
III.A.1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112
(k) (1)
As set forth in Parts I. and II., DCF provided multiple timely and appropriate services for Audrey. Those services included case management services, psychological and psychiatric evaluations by court order, inpatient and outpatient psychiatric services including medication management, inpatient and outpatient substance abuse treatment through Morris Foundation, parent training through Family Ties, visitation and transportation.
In 11/01, the court (R.J.) approved a permanency plan of TPR and adoption on behalf of Rudesia.
Furthermore, the court has found in Part II.A. that this respondent mother is unwilling or unable to achieve timely benefit from the extension of additional reunification efforts. CT Page 116-j
III.A.2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW § 17a-112 (k) (2)
Through the services provided to Audrey as described in Parts I. and II., DCF made reasonable efforts to reunite the child with this respondent, pursuant to the Federal Adoption Assistance and Child Welfare Act of 1980, as amended. The court found that DCF made reasonable efforts in 10/00 and 5/01.
III.A.3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (k) (3)
In 10/00 and subsequently in 5/01, the court ordered specific steps for Audrey. Audrey has been substantially noncompliant with the above mentioned steps. To date, Audrey has not completed substance abuse treatment. It would appear as though she is presently in need of a higher level of treatment as she has provided urine samples which are positive for cocaine. Audrey adamantly denies any mental health issues and therefore, she is not in any individual treatment. She has visited consistently with her daughter, however, her behavior was so inappropriate the visits were suspended to protect the child from emotional harm by the respondent mother. Audrey completed parenting classes as offered through Family Ties.
Presently, Audrey continues to struggle with the same issues which caused the removal of Rudesia.
III.A.4. THE CHILD'S FEELINGS AND EMOTIONAL TIES — § 17a-112
(k) (4)
Audrey last visited with Rudesia in 11/01. Until that time, she had consistent contact from Rudesia and the child related to her as a parental figure. However, Rudesia is keenly aware of her mother's limitations and since the cessation of visitation, she has not questioned the whereabouts of her mother. Rudesia has been in her current foster home since October of 2000. Rudesia and her foster mother share a warm relationship and refer to each other as mother and daughter. Rudesia also interacts well with her foster father and siblings. This family has expressed an interest in serving as an adoptive family to Rudesia.
III.A.5. AGE OF THE CHILD — § 17a-112 (k) (5)
Rudesia was born in 3/90 and is twelve years old.
IIIA.6. PARENT'S EFFORTS TO ADJUST HER CIRCUMSTANCES § 17a-112 (k) CT Page 116-k (6)
Audrey has made minimal attempts to change her circumstances to allow reunification to be a viable plan for Rudesia. While Audrey has participated in both substance abuse and psychological evaluations, her follow through with subsequent recommendations has been poor. She has failed to make any meaningful progress toward achieving and sustaining sobriety or toward alleviating her complex psychological issues.
Audrey has not in any way adjusted her circumstances so that she can fulfill a parental role for Rudesia.
Giving Audrey additional time, considering Rudesia's age and needs, would not likely bring her parenting performance within acceptable standards sufficient to make reunification in Rudesia's best interests.
III.A.7. EXTENT TO WHICH THE PARENT WAS PREVENTED FROM MAINTAINING A RELATIONSHIP WITH THE CHILD — § 17a-112 (k) (7)
No unreasonable conduct by the child protection agency, foster parents or third parties prevented either Audrey from maintaining her relationship with the child at issue in this case. Although the limitations inherent in the foster care system were in effect, Audrey's economic circumstances did not prevent the maintenance of such relationships.
III.B. BEST INTERESTS OF THE CHILD — § 17a-112 (j) (2)
The court is next called upon to determine whether terminating the parental rights of Audrey would be in Rudesia's best interests.[13]
Applying the appropriate legal standards[14] to the facts which have been clearly and convincingly proven in this case, the court finds this issue in favor of the petitioner.
In determining whether termination of the respondent's parental rights would be in the child's best interests, the court has examined the relevant factors, which include her opportunities for sustained growth, development, well-being, stability and continuity of her environment; her length of stay in foster care; the nature of her relationship with the foster parents and the biological parent; and the degree of contact maintained with her biological parent.[15] In re Alexander C.,60 Conn. App. 555, 559 (2000); In re Shyina B., 58 Conn. App. 159, 167
(2000); In re Savanna M., supra, 55 Conn. App. 816. In a matter such as this, the court is further called upon to balance the child's intrinsic need for stability and permanency against the benefits of maintaining a CT Page 116-l connection with her biological parent. See Pamela B. v. Ment,244 Conn. 296, 314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity). Under such scrutiny, the clear and convincing evidence establishes that, in this matter, it is not in Rudesia's best interests to continue to maintain any legal relationship with her parent, the respondent mother Audrey.
It appears that Audrey has affection and concern for Rudesia, and that she is interested in her well-being. However, when assessing the best interest issues in this case, it is important for all to acknowledge that parenting involves more than showing appropriate interest in and for one's child. Parenting involves significant capacity to provide nurturing care, and the ability to show dedication and consistent, predictable, safe and reliable support for the child in question. The circumstances of this case clearly and convincingly reflect that Audrey has never reached the point where she can be relied upon to meet these critical elements of parenting. Her continuing problems with substance abuse and mental issues make Rudesia's return to her care not merely an exercise in futility, but also an endangerment of this child . . . In view of Rudesia's needs as well as her special needs, a stable home environment is even more critical.
Overall, in this case, "[a] parent's love and biological connection . . . is simply not enough" to serve as the basis for continuing the legal relationship between the respondent mother and her children. In re AshleyS., supra, 61 Conn. App. 667.
Rudesia has a healthy bond with her foster family and her foster home is her home. The foster family is considered adoption.
Rudesia's counsel indicated that Rudesia's foster home was a good one and that she feels loved there. Elizabeth Tiru, Rudesia's therapist, testified that, although the TPR will impact Rudesia, she believed that the TPR would be for the best. She indicates Rudesia has a good relationship with her foster parents, feels their love and the foster parents are always there for her. She indicated that the present foster home is the best place for Rudesia.
Dr. Krulee, who examined Audrey on two occasions, on 11/3/00 and 5/4/01, testified that he found Audrey "seriously psychiatrically compromised." His diagnosis was that Audrey suffered from the following, among other concerns:
Axis I: Alcohol Dependence, remission status unknown; Heroin CT Page 116-m Dependence, remission status unknown; Cocaine Dependence, remission status unknown; Depressive Disorder (Not Otherwise Specified) in remission; Psychological Factors affecting Physical Condition, apparently in Remission.
 Axis II: Personality Disorder, Not Otherwise Specified with Schizotypal and Borderline Features (primary diagnosis); Borderline Intellectual Functioning.
Axis III:[16]
Carpal Tunnel Syndrome leading to chronic pain.
Axis IV: Dual diagnosis issues, loss of custody of child.
Axis V: Current GAF=58.
In his testimony, Dr. Krulee described Audrey as showing poor historic ability, tangential thinking, vagueness and evasiveness. He believed her to be completely unreliable, impulsive, and irresponsible. He felt that she showed poor judgment and that she would decompensate under pressure.
Dr. Krulee opined as an expert witness that Audrey had serious impediments to being a primary custodial parent.
Dr. Grenier testified that she performed a partial evaluation of Audrey in 1/01. She indicated that she was unable to complete the evaluation due to Audrey's failure to return for the second half of the evaluation. Dr. Grenier described Audrey as having deficient memory, loose and tangential thinking and difficulty in processing information. She found that Audrey had mild cognitive impairments, but was unable to test for more significant cognitive impairments, due to Audrey's failure to appear for the second part of the evaluation.
Dr. Grenier testified that Audrey's continued substance abuse problems would worsen her cognitive impairments. In her written report, she wrote:
 There are clear indications that she is continuing to use substances, such as alcohol, if not others as well. The use of substances combined with her medical illness is likely to lead to a quicker deterioration in her neuropsychological status. Given her current deficits and continued use of at least alcohol, it is unlikely that [Audrey] will be able to provide appropriate child care at this time. Her comments concerning suicide and her insurance policy should be attended to, CT Page 116-n since they suggest some suicidal ideation, which may become more active if she comes to believe that the likelihood of her daughter being returned to her is not a real possibility in the near future.
She opined that Audrey was unable to provide care for a child due to her problems.
Social worker Norvig, who was stipulated to by all parties as an expert in matters of social work, also made several relevant points in her testimony that were crucial to the issue of Rudesia's best interests. Norvig emphasized that Audrey has had chronic substance abuse and mental health problems which predated Rudesia and that Audrey has never completed any rehabilitative programs. She testified that Audrey presently is not in any rehabilitative programs or in medical treatment. Norvig characterized Audrey as being incapable of putting Rudesia's needs above her own. According to Norvig, she refuses to acknowledge her mental illness and substance abuse problems and refuses to address them.
Both Norvig and the social study discussed Audrey's inability to conduct herself appropriately at DCF visitations prior to their cessation. Norvig testified to her inappropriate interrogation of Rudesia concerning her placement and her behavior concerning the menstrual cycle episode. Her threat, vocalized to Rudesia, that she would commit suicide unless Rudesia returned to her, is clearly and convincingly an indicator that Audrey cannot be entrusted with the care of any child.
Norvig testified that there had been no problems with Rudesia's foster placement and that she referred to the foster parents as mom and dad. Norvig opined that the TPR was in Rudesia's best interests.
Rudesia is young and is dependent upon a responsible, nurturing caregiver. Unfortunately, she has a biological mother who cannot conform her conduct to acceptable standards as a parent, who cannot remain substance free, who has not attempted to benefit from rehabilitative programs, and who cannot realize her own mental health and substance abuse difficulties. Audrey has clearly demonstrated her inability to parent Rudesia, and it would be illogical to contemplate her return. Rudesia must be placed into an environment where she will be provided with the structure and guidance that she needs in order to be able to grow up to be a successful adult and contributing member of society. The State has shown by clear and convincing evidence that she receives that structure and guidance in her present foster home.
Our courts have recognized that "long-term stability is critical to a child's future health and development." In re Eden F., supra, CT Page 116-o250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see also In re JuvenileAppeal (84-CD) , 189 Conn. 276, 292, 455 A.2d 1313 (1983).
It is not in Rudesia's best interests to allow her to languish in foster care, awaiting Audrey's development of an adequate parenting capacity and control over her substance abuse and mental health issues. Rudesia "should not be further burdened by having to wait for [her] mother to achieve the level of competency necessary to serve as her parent. In re Amneris P., supra, 66 Conn. App. 385. The court therefore concludes that this child is entitled to the benefit of ending, without further delay, the long period of uncertainty as to the availability of her biological parent as her caretaker. Severance of her legal bonds to Audrey, and freeing her for adoption will best eliminate the stressful limbo which persists while the TPR issues remain before this court.
The court has balanced the child's intrinsic need for stability and permanency against the benefits of maintaining a legal connection with Audrey, and finds that the child's interests in sustained growth, development, well-being, and continuity and stability of her environment cannot be met by leaving her in foster care. In its totality, the evidence in this case clearly and convincingly is in favor of termination of the respondent mother's parental rights. Pamela B. v. Ment, supra,244 Conn. 313-14. Accordingly, with respect to the best interests of the child contemplated by § 17a-112 (j) (2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, the court finds that termination of the parental rights of Audrey is in the best interest of Rudesia.
 IV. ORDER OF TERMINATION
WHEREFORE, after due consideration of the child's sense of time, her need for a secure and permanent environment, the relationship she has developed with her foster parents and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the child's best interests, the court issues the following ORDERS:
That the parental rights of Audrey are hereby terminated as to her daughter Rudesia. CT Page 116-p
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Rudesia for the purpose of securing an adoptive family or other permanent placement for her.
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court, as required by law. That primary consideration for adoption of Rudesia shall be offered to her current foster parents, if appropriate.
 JUDGMENT MAY ENTER ACCORDINGLY.
Taylor, J.